13 CV 2579

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WILLIE B. FEARS, II; RODNEY A. WILLIAMS; JAMES AMERE WOFFORD; TORY M. WOODBURY; FRED MCCRARY; GIJON M. ROBINSON; and BRIAN "SKIP" HICKS, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| VS. | ) ) |
| NATIONAL FOOTBALL LEAGUE and NFL PROPERTIES, LLC, | ) ) ) |
| Defendants. | ) ) ) ) |

RECEIVED

APR 18 2013

U.S.D.C. S.D. N.Y.
CASHIERS

**COMPLAINT**
**(Jury Trial Demanded)**

Plaintiffs, by and through undersigned counsel, initiate this action for damages against the National Football League and NFL Properties LLC (hereinafter collectively the "NFL Defendants" and/or the "NFL") and allege as follows:

## INTRODUCTION

1.     The National Football League ("NFL" or "the League") is America's most successful and popular professional sports league. With thirty-two (32) member teams, the League is a multi-billion dollar business. The NFL is and has always been eager to avoid negative publicity and protect its business. As a result, the NFL regulates all aspects of the operations of its member teams, including League policies, player appearances, marketing, and safety, among other items.

2.     As recognized by the League, professional football is unquestionably a tough, aggressive, and physically demanding sport. Injuries are common. As such, it is vital to the

safety of the players that the NFL act reasonably, through research studies and other means, to identify the risks of serious injury associated with playing professional football, to keep the teams and players informed of the risks that they identify, and to take reasonable steps based upon their findings from appropriate and adequate studies to protect players. Aware of this responsibility, the NFL, through its own initiative, created the Mild Traumatic Brain Injury ("MTBI") Committee in 1994 to research, and presumably ameliorate, what was already a tremendous problem in the League: concussions and head injuries.

3.      The rash of head injuries incurred during NFL play has been noted in a wide variety of news articles and television segments and was addressed recently by the League in an announcement that it would penalize illegal blows to the head. But, as noted herein, debilitating head injuries in football are not new problems. For decades, the League's players have been plagued by the devastating effects of concussions and head injuries arising from repeated hits forceful enough to cause those concussions.

4.      Despite overwhelming medical evidence that on-field concussions lead directly to brain injuries and frequent tragic repercussions for retired players, up until recently, the NFL not only failed to take effective action to protect its players, but also concealed/failed to inform former and current players of the true extent of their injuries and the true dangers associated with concussions.

5.      Instead, the NFL deliberately misrepresented and/or concealed conclusive, independent medical evidence on the issue by paying the "hand-picked" committee of physicians who were researching MTBI to do the same. While athletes in other professional sports who had suffered concussions were being effectively "shut down" for long periods of time or full seasons,

the NFL Defendants continued to allow teams to send players who had suffered concussions back into the very game in which the injury occurred.

6.      Moreover, the NFL purposefully attempted to complicate the issue for NFL players, as it repeatedly refuted the connection between concussions and long-term brain injuries. Congress has vehemently objected to the NFL's handling of the issue on multiple occasions, and expert neurologists know the true score. The reality is that in the 17 years since its formation, the MTBI Committee has served as nothing short of a roadblock to any genuine attempt to appropriately inform and protect teams and NFL players regarding concussions and resultant brain injury. The Committee's misrepresentation and concealment of relevant medical information over the years has caused an increased risk of debilitating and/or life-threatening injury to players who were purposefully not being apprised of the findings.

7.      The NFL has failed to satisfy its duty to take reasonable steps necessary to protect players from devastating head injuries. Moreover, the NFL has done everything in its power to hide the issue and mislead players concerning the risks associated with concussions.

8.      This action arises from the pathological and debilitating effects caused by the concussive and sub-concussive impacts that have afflicted former professional football players in the NFL. For many decades, evidence has linked repetitive MTBIs to long-term neurological problems in many sports, including football. The NFL, as the organizer, marketer, and face of the most popular sport in the United States, in which MTBI is a regular occurrence and in which players are at risk for MTBI, was aware of the evidence and the risks associated with repetitive traumatic brain injuries virtually at the inception, but deliberately ignored and actively concealed the information from the Plaintiffs and all others who participated in organized football at all levels.

9.     This action, brought by former NFL players, seeks a declaration of liability, injunctive relief, medical monitoring, and financial compensation for the long-term chronic injuries, financial losses, expenses, and intangible losses suffered by the Plaintiffs and their families as a result of the Defendants' intentional tortious misconduct, including fraud, misrepresentation, and negligence.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as there is diversity of citizenship amongst the parties and the amount in controversy exceeds $75,000 for each Plaintiff.

11.     Venue lies properly in this district pursuant to 28 U.S.C. § 1391(a)(2) and 1391(b)(2) as a substantial part of the events and/or omissions giving rise to the claims stem from activities within this jurisdiction, and the Defendants conduct substantial business in this jurisdiction.

## PARTIES

12.     Plaintiff Willie B. Fears, II, is a former professional football player.  Mr. Fears joined the Cincinnati Bengals in 1987.  During his NFL career, Mr. Fears played defensive end for the Cincinnati Bengals in 1987 and defensive tackle for the Minnesota Vikings in 1990.  Mr. Fears is a resident of Little Rock, Arkansas.

13.     Plaintiff Rodney A. Williams is a former professional football player. Mr. Williams joined the Oakland Raiders in 1998.  During his career, Mr. Williams played wide receiver and return specialist for the Oakland Raiders from 1998 to 2000 and for the San Diego Chargers during the 2001 Pre-Season.  Mr. Williams is a resident of Lancaster, California.

14.     Plaintiff James Amere Wofford is a former professional football player. Mr. Wofford joined the Minnesota Vikings in 2001. During his career, Mr. Wofford played running back and return specialist for the Minnesota Vikings from 2001 to 2003. Mr. Wofford is a resident of Bakersfield, California.

15.     Plaintiff Tory M. Woodbury is a former professional football player. Mr. Woodbury joined the New York Jets in 2001. During his NFL career, Mr. Woodbury played quarterback/wide receiver/special teams for the New York Jets from 2001 to 2004, quarterback/safety/special teams for the New Orleans Saints in 2004, and quarterback/special teams for the Buffalo Bills from 2005 to 2006. Mr. Woodbury is a resident of Dover, Delaware.

16.     Plaintiff Fred McCrary is a former professional football player. Mr. McCrary joined the Philadelphia Eagles in 1995. During his NFL career, Mr. McCrary played fullback and special teams for the Philadelphia Eagles in 1995, the New Orleans Saints in 1997, the San Diego Chargers from 1999 to 2002, the New England Patriots in 2003, the Atlanta Falcons from 2004 to 2006, and the Seattle Seahawks in 2007. Mr. McCrary is a resident of Canton, Georgia.

17.     Plaintiff Gijon M. Robinson is a professional football player. Mr. Robinson joined the Indianapolis Colts in 2007. During his NFL career, Mr. Robinson played tight end for the Indianapolis Colts from 2007 to 2011. Mr. Robinson is a resident of Indianapolis, Indiana.

18.     Plaintiff Brian "Skip" Hicks is a former professional football player. Mr. Hicks joined the Washington Redskins in 1998. During his NFL career, Mr. Hicks played running back for the Washington Redskins from 1998 to 2000, the Tennessee Titans in 2001, and the Carolina Panthers in 2002. Mr. Hicks is a resident of Agoura Hills, California.

19.     Defendant National Football League ("NFL") is a non-incorporated entity organized and existing under the laws of the State of New York, with its principal place of

business at 280 Park Avenue, 15 Floor, New York, NY 10017.    The NFL is an unincorporated association consisting of separately owned and independently-operated professional football teams which operate out of many different cities and states within this country. The NFL is engaged in interstate commerce in the business of, among other things, promoting, operating, organizing, and regulating the major professional football league in the United States. The NFL is not, and has not been, the employer of the Plaintiffs, who were employed during their respective careers in professional football by the independent clubs (hereinafter "Teams" or "Clubs"). The United States Supreme Court held in *American Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2212-13 (2010), that each Team that is a member of the NFL is a legally distinct and separate entity from both the other Teams and the NFL itself.  Defendant NFL's tortuous conduct originated from, and was experienced in part in, New York, and its effect occurred in the various States and locations in which the Plaintiffs' NFL Teams were instructed and assigned to play.

20.    Defendant NFL Properties, LLC is the successor-in-interest to National Football League Properties, Inc. and a limited liability company organized and existing under the laws of the State of Delaware with its headquarters in the State of New York.  NFL Properties is engaged in, among other activities, approving, licensing, and promoting equipment used by all the NFL teams. Defendants NFL and NFL Properties, LLC will hereinafter be collectively referred to as the "NFL" and/or "Defendants."

## MASS ACTION AND JOINDER ALLEGATIONS

21.    Joinder is permissible under Fed. R. Civ. P. 20(a) in that the claims alleged herein arise out of the same occurrences, and questions of law and/or fact common to all Plaintiffs arise in this action.

22.     Common questions of law and fact will arise in this action, including but not limited to the following:

a)      Whether the NFL Defendants, through their own voluntary undertaking, were negligent in their response to the dangers of repetitive traumatic brain injuries and/or concussions sustained by the Plaintiffs during NFL games, practices or other activities;

b)      Whether the NFL Defendants conspired to defraud the Plaintiffs by ignoring and/or misrepresenting the risks of repetitive traumatic brain injuries and/or concussions sustained by the Plaintiffs during NFL games, practices and other activities; and

c)      Whether the repetitive traumatic brain injuries and/or concussions sustained by the Plaintiffs during NFL games, practices and other activities cause, among other things, latent neurodegenerative brain disorders, memory loss, and brain disease.

## FACTUAL ALLEGATIONS

### GENERAL INFORMATION ABOUT THE NFL

23.     The NFL acts as a trade association for thirty-two (32) franchise owners, and consists of two (2) structured conferences, the AFC and the NFC, which are comprised of thirty-two (32) Teams.

24.     The NFL generates approximately $9,300,000,000.00 in gross income per year. The organization oversees America's most popular spectator sport, acting as a trade association for the benefit of the thirty-two independently operated Teams. The NFL's average attendance per game in 2009 was 67,509.

25.     The NFL has, since its inception in the first half of the twentieth century, governed and promoted the game of football, and as referenced in detail herein, it was created

and established to act as the governing body, establishing rules related to player health and safety, League policies, and Team ownership.

26.     The NFL generates revenue mostly through marketing sponsorships, licensing merchandise, and by selling national broadcasting rights to the games. The Teams share a percentage of the League's overall revenue. The NFL earns billions of dollars from its telecasting deals with, inter alia, ESPN ($1.1 billion), DirecTV ($1 billion), NBC ($650 million), Fox ($712.5 million), and CBS ($622.5 million).

27.     Annually, the NFL redistributes approximately $4 billion in radio, television, and digital earnings to the Teams or approximately $125 million per Team. Those revenue numbers show no sign of declining and have increased since 2009. Also, the NFL enjoys partial monopoly power through an anti-trust exemption granted via the federal Sports Broadcasting Act that allows the NFL to sell television rights for all 32 Teams as a single unit.

28.     In part because of their financial power, high visibility, and role providing contemporaneous sports/media coverage, Defendants have had enormous influence over the game of football at all levels of the game. Over many decades, the NFL Defendants' influence has been expanded through their use of the media. Through NFL films, the NFL Network, and www.NFL.com, the NFL Defendants have promoted NFL football via every mass communication medium available.

<u>THE NATURE OF HEAD INJURIES SUFFERED BY NFL PLAYERS</u>

29.     The American Association of Neurological Surgeons defines traumatic brain injury as "a blow or jolt to the head, or a penetrating head injury that disrupts the normal function of the brain." Symptoms of a traumatic brain injury can be mild, moderate or severe, depending on the extent of damage to the brain. Mild cases may result in a brief change in

mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

30.     Medical science has known for many decades that repetitive and violent jarring of the head or impact to the head can cause MTBI with a heightened risk of long term, chronic neuro-cognitive sequelae.

31.     MTBIs may be concussive or sub-concussive. Concussions are serious injuries that can permanently damage the brain, impair thinking ability, and alter memory and judgment. The American Association of Neurological Surgeons defines a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma."

32.     Generally, concussions occur when the head either accelerates rapidly and then is stopped or spun suddenly by some external force.  Such sudden, cranial impact causes the brain to torque, which may snap blood vessels, kills brain cells (neurons), and/or shear delicate connections (axons) within the organ to cause a concussion.

33.     The symptoms of a concussion generally include confusion, blurred vision, memory loss, nausea, and at times, unconsciousness.  Although these symptoms will become apparent immediately after the impact responsible for a concussion, medical evidence indicates that the symptoms will reappear a few hours or days later if the brain has not fully healed from the initial injury.

34.     The NFL Defendants have known or should have known for many years that MTBI generally occurs when the head either accelerates rapidly and then is stopped, or is rotated rapidly. Similarly, the NFL Defendants have known or should have known that the results

frequently include, among other things, confusion, blurred vision, memory loss, nausea, and sometimes unconsciousness.

35.     According to neurologists, once a person suffers a concussion, he is almost four (4) times more likely to sustain a second concussion.  Additionally, after several concussions, lesser impact will amount to comparable injury and the injured person will require additional time to fully recover.   For these reasons, among others, medical data researchers have definitively linked recurrent concussions to dementia and long-term cognitive impairment.

36.     Clinical and neuro-pathological studies by some of the nation's foremost experts demonstrate that multiple concussions sustained during an NFL football player's career may cause severe cognitive problems such as depression and early-onset dementia.  In 2000, a study of 1,090 former NFL football players found that more than sixty (60) percent had at least one concussion in their careers and twenty-six (26) percent had, at some point, sustained three or more concussions.

37.     Medical specialists have also determined head trauma to be the main triggering factor of progressive degeneration of brain tissue.  The changes in the brain associated with such degeneration can begin months, years, or even decades after the last concussion or the end of an active, lifelong career in and/or devotion to contact sports like football.  Brain degeneration, in turn, leads to memory loss, confusion, impaired judgment, paranoia, impulse control problems, aggression, depression, and eventually, progressive dementia.

38.     The NFL Defendants have known or should have known for many years that medical evidence has shown that symptoms of MTBI can appear hours or days after the injury, indicating that the injured party has not healed from the initial blow.

39.     The NFL Defendants have known or should have known for many years that once a person suffers an MTBI, he is up to four times more likely to sustain a second one. Additionally, after suffering even a single sub-concussive or concussive blow, a lesser blow may cause MTBI, and the injured person requires more time to recover. This goes to the heart of the problem: players being unaware of the serious risk posed to their long-term neuro-cognitive health.

40.     The NFL Defendants have known or should have known for many years that clinical and neuro-pathological studies by some of the nation's foremost experts demonstrate that multiple head injuries or concussions sustained during an NFL player's career can cause severe neuro-cognitive problems such as memory loss, depression, and early-onset of dementia.

41.     The NFL Defendants have known or should have known for many years that repeated traumatic head impacts (including sub-concussive and concussive blows) cause ongoing and latent brain injury. These injuries have been documented and associated with sports-related head impacts in both football and boxing.

41.     In 1948, the New York State Legislature created the Medical Advisory Board of the New York Athletic Commission for the specific purpose of creating mandatory rules for professional boxing designed to prevent or minimize the health risks to boxers. After a three year study, the Medical Advisory Board recommended, among other things, (a) an accident survey committee to study ongoing accidents and deaths in boxing rings; (b) two physicians at ring-side for every bout; (c) post-bout medical follow-up exams; (d) a 30-day period of no activity following a knockout and a medical follow up for the boxer, all of which was designed to avoid the development of "punch drunk syndrome," also known at the time as "traumatic encephalopathy"; (e) a physician's prerogative to recommend that a boxer surrender temporarily

his boxing license if the physician notes that boxer suffers significant injury or knockout; and (f) a medical investigation of boxers who suffer knockouts numerous times. These recommendations were codified as rules of the New York State Athletic Commission.

42.     In or about 1952, the *Journal of the American Medical Association* published a study of encephalopathic changes in professional boxers.

43.     That same year, an article published in the *New England Journal of Medicine* recommended a three-strike rule for concussions in football (*i.e.,* recommending that players cease to play football after receiving their third concussion.)

44.     In 1962, Drs. Serel & Jaros looked at the heightened incidence of chronic encephalopathy in boxers and characterized the disease as a "Parkinsonian" pattern of progressive decline.

45.     A 1963 study by Drs. Mawdsley & Ferguson published in *Lancet* found that some boxers sustain chronic neurological damages as a result of repeated head injuries. This damage manifested in the form of dementia and impairment of motor function.

46.     In 1969 (and then again in the 1973 book entitled *Head and Neck Injuries in Football*), a paper published in the *Journal of Medicine and Science in Sports* by a leading medical expert in the treatment of head injuries recommended that any concussive event with transitory loss of consciousness requires the removal of the football player from play and requires monitoring.

47.     In 1973, Drs. Corsellis, Bruton, & Freeman-Browne studied the physical neurological impact of boxing. This study outlined the neuro-pathological characteristics of "Dementia Pugilistica", including loss of brain cells, cerebral atrophy, and neurofibrillary tangles.

48.     A 1975 study by Drs. Gronwall & Wrightson looked at the cumulative effects of concussive injuries in non-athletes and found that those who suffered two concussions took longer to recover than those who suffered from a single concussion.  The authors noted that these results could be extrapolated to athletes given the common occurrence of concussions in sports.

49.     In the 1960s and 70s, the development of the protective face mask in football allowed the helmeted head to be used as a battering ram.  By 1975 the number of head and neck injuries from football that resulted in permanent quadriplegias in Pennsylvania and New Jersey lead to the creation of the National Football Head and Neck Registry, which was sponsored by the National Athletic Trainers Association and the Sports Medicine Center at the University of Pennsylvania.

50.     Between 1952 and 1994, numerous additional studies were published in medical journals including the *Journal of the American Medical Association*, *Neurology*, and the *New England Journal of Medicine*, and *Lancet* warning of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions.   These studies collectively established that:

> repetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function;
>
> encephalopathy (dementia pugilistica) is caused in boxers by repeated sub-concussive and concussive blows to the head;
>
> acceleration and rapid deceleration of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;
>
> with respect to mild head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;
>
> immediate retrograde memory issues occur following concussions;
>
> mild head injury requires recovery time without risk of subjection to further injury;

head trauma is linked to dementia;

a football player who suffers a concussion requires significant rest before being subjected to further contact; and

minor head trauma can lead to neuro-pathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

51.     In the early 1980s, the Department of Neurosurgery at the University of Virginia published studies on patients who sustained MTBI and observed long-term damage in the form of unexpected cognitive impairment.  The studies were published in neurological journals and treatises within the United States.

52.     In 1982, the University of Virginia and other institutions conducted studies on college football teams, which showed that football players who incurred MTBI suffered pathological short-term and long-term damage.  With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.  The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma.

53.     In 1986, Dr. Robert Cantu of the American College of Sports Medicine published Concussion Grading Guidelines, which he later updated in 2001.

54.     By 1991, three distinct medical professionals/entities, all independent from the NFL—Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado Medical Society—developed return-to-play criteria for football players suspected of having sustained head injuries.

55.     In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina conducted a study involving eighteen thousand (18,000) collegiate and high school football players.  The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season.

56.     In 1999, former Pittsburgh Steeler and Hall of Fame inductee Mike Webster filed with the NFL a request that he receive complete disability benefits based on the fact that he had sustained repeated and disabling head impacts while a player for the Steelers.  In 1999, Webster submitted extensive medical reports and testimony that stated, among other things, that Webster suffered from "traumatic or punch drunk encephalopathy [brain disease]" sustained from playing football that left Webster totally and permanently disabled as of 1991.

57.     The NFL's own physician independently examined Webster and concluded that Webster was mentally "completely and totally disabled as of the date of his retirement and was certainly disabled when he stopped playing football sometime in 1990."

58.     Webster died in 2002 at the age of fifty. In December 2006, the Estate of Webster received an unpublished opinion from the United States Court of Appeals for the Fourth Circuit that affirmed the decision of the District Court that the administrator had wrongly denied him benefits.  In its opinion, the Fourth Circuit stated that the NFL Plan had acknowledged that the multiple head injuries Webster sustained during his playing career (1974-1990) ". . . had caused Webster eventually to suffer total and permanent mental disability . . . ." Thus, the NFL, through its own expert medical testimony and the expert testimony submitted by Webster knew and accepted that repetitive traumatic brain injuries sustained by a Hall of Fame player led to long-term encephalopathy and permanent mental disability.

59.     A 2000 study, which surveyed 1,090 former NFL players, found that more than sixty (60) percent had suffered at least one concussion, and twenty-six (26) percent had suffered three (3) or more, during their careers.  Those who had sustained concussions reported more problems with memory, concentration, speech impediments, headaches, and other neurological problems than those who had not been concussed.

60.     Also in 2000, a study presented at the American Academy of Neurology's 52nd Annual Meeting and authored by Dr. Barry Jordan, Director of the Brain Injury Program at Burke Rehabilitation Hospital in White Plains, New York, and Dr. Julian Bailes, surveyed 1,094 former NFL players between the ages of 27 and 86 and found that: (a) more than 60% had suffered at least one concussion in their careers with 26% of the players having three or more and 15% having five or more; (b) 51% had been knocked unconscious more than once; (c) 73% of those injured said they were not required to sit on the sidelines after their head trauma; (d) 49% of the former players had numbness or tingling; 28% had neck or cervical spine arthritis; 31% had difficulty with memory; 16% were unable to dress themselves; 11% were unable to feed themselves; and eight suffered from Alzheimer's disease.

61.     A 2001 report by Dr. Frederick Mueller that was published in the *Journal of Athletic Training* reported that a football-related fatality has occurred every year from 1945 through 1999, except for 1990.  Head-related deaths accounted for 69% of football fatalities, cervical spinal injuries for 16.3%, and other injuries for 14.7%.  From 1984 through 1999, sixty-nine football head-related injuries resulted in permanent disability.

62.     The University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a strong correlation between

depression, dementia, and other cognitive impairment in NFL players and the number of concussions those players had received.

63.    A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

64.    The NFL Defendants have known or should have known for many years that published peer reviewed scientific studies, neuropathology studies, brain imaging tests, and neuropsychological tests on many former football players, including former NFL players, have established that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early-onset of Alzheimer's Disease; dementia; depression; deficits in cognitive functioning, reduced processing speed, and attention and reasoning; loss of memory; sleeplessness; mood swings; personality changes; and the debilitating and latent disease known as Chronic Traumatic Encephalopathy ("CTE"). The latter condition involves the slow build-up of the Tau protein within the brain tissue that causes diminished brain function, progressive cognitive decline, and many of the symptoms listed above. CTE is also is associated with an increased risk of suicide.

65.    Medical studies have proven that sub-concussive forces, repeated impact, and repetitive head trauma may lead to degenerative brain disease.  CTE is one such progressive degenerative disease of the brain found in athletes (and others) with a history of repetitive concussions.   Conclusive studies have shown this condition to be prevalent in retired professional football players who have a history of head injury.

66.     The NFL Defendants have known or should have known for many years that CTE is found in athletes, including football players and boxers, with a history of repetitive head trauma. Published papers have shown that this condition is prevalent in retired professional football players who have a history of head injury. The changes in the brain caused by repetitive trauma are thought to begin when the brain is subjected to that repetitive trauma, but symptoms may not appear until months, years, or even decades after the last traumatic impact or the end of active athletic involvement.

67.     The NFL Defendants have known for many years of the reported papers and studies documenting autopsies on over twenty-five former NFL players. The papers and studies show that over ninety percent of the players suffered from CTE.

### THE NFL'S KNOWLEDGE AND ROLE IN PROTECTING ITS PLAYERS

68.     At all times, the NFL's unique historical vantage point at the apex of the sport of football, paired with its unmatched resources as the most well-funded organization devoted to the business of the game, has afforded it unparalleled access to data relating to the effect of head impacts on football players and made it an institutional repository of accumulated knowledge about head injuries to players.

69.     The NFL's accumulated knowledge about head injuries to players, and the associated health risks therefrom, was at all times vastly superior to that available to the Plaintiffs.

70.     From its inception, the NFL unilaterally created for itself the role of protecting players, informing players of safety concerns, and imposing unilaterally a wide variety of rules to protect players from injuries that were costly to the player, the game, and profits. From the

beginning, the NFL held itself out and acted as the guardian of the players' best interests on health and safety issues.

71.    For these reasons, players and their families have relied on the NFL to intervene in matters of player safety, to recognize issues of player safety, and to be truthful on issues of player safety.

72.    In a recent public admission, the NFL stated that "[s]ince its earliest days, the league has continuously taken steps to ensure that the game is played as fairly as possible without unnecessary risk to its participants, including making changes and enhancements to game safety rules." (www.nflhealthsasfety.com/commitment/regulations) (2011-2012).

73.    On information and belief, since its inception, the NFL received and paid for advice from medical consultants regarding health risks associated with playing football, including the health risks associated with concussive and sub-concussive injuries. Such ongoing medical advice and knowledge placed the NFL in a position of ongoing superior knowledge to the players. Combined with the NFL's unilateral and monopolistic power to set rules and determine policies throughout its game, the NFL at all relevant times was in a position to influence and dictate how the game would be played and to define the risks to which players would be exposed.

74.    As a result, the NFL unilaterally assumed a duty to act in the best interests of the health and safety of NFL players, to provide truthful information to NFL players regarding risks to their health, and to take all reasonable steps necessary to ensure the safety of players.

75.    The NFL's voluntary actions and authority throughout its history show that as early as the 1920s the NFL shouldered for itself the common law duty to make the game of

professional football safer for the players and to keep the players informed of safety information they needed to know.

76.    The NFL's historical actions in connection with these legal duties have included, but are not limited to, the following: adding a field judge (1929); establishing hash-marks at 10 yards from the sidelines (1933); establishing the penalty of unnecessary roughness for a deliberate rough contact on the passer after the pass is made (1938); making helmets mandatory (1943); adding a back field judge (1947); establishing a rule that the ball is dead when a runner touches the ground with any part of his body except his hands while in the grasp of an opponent (1955); establishing a rule that the ball is dead immediately if the runner touches the ground with any part of his body except his hands after being contacted by a defensive player (1956); establishing a penalty for grabbing the face mask of any  opponent except a runner (1956); establishing a penalty of grabbing the face mask of any opponent (1962); requiring that goal posts be offset from the goal line (1966); establishing a rule that a player who signals for a fair catch cannot block or initiate contact with one of the kicking team's players until the ball touches a player (1967); establishing a rule that a defensive player who jumps or stands on a teammate or who is picked up by a teammate cannot attempt to block an opponent's kick (1973); establishing a rule that no receiver can be blocked below the waist after moving beyond the line of scrimmage (1974); establishing a rule that eligible receivers who take a position more than two yards from the tackle cannot be blocked below the waist (1974); establishing a rule that a defender is not permitted to run or dive into a ball carrier who has fallen to the ground untouched (1976); establishing a rule that it is illegal for a defensive lineman to strike an opponent above the shoulders during his initial charge (1977) (previously the NFL made this illegal only during the first step); establishing that it is illegal for a wide receiver to clip an opponent anywhere

(1977); establishing rules as to mandatory equipment (1979); establishing that it is illegal for a player in the backfield to chop an outside rusher on a pass play (1979); establishing that it is illegal to throw a punch or forearm or to kick an opponent (1979); and establishing that it is illegal to strike, swing, or club an opponent in the head, neck or face (1980).

77.     As the sport's governing entity, the NFL has made it known to players and Teams alike that the NFL actively and pervasively governs player conduct and health and safety both on and off the field. In public statements since its inception, the NFL has stated that its goals include taking necessary steps for the safety, health and well-being of players and their families.

78.     The NFL's approach has been paternalistic and has included comprehensive rookie training programs to teach new players how to manage their personal lives, inquiries from the media, and newly acquired income.

79.     For decades, the NFL voluntarily instituted programs to support player health and safety, on and off the field, and the players and their families looked to the NFL for guidance on these issues.

80.     By way of example only, in 1959, the NFL unilaterally established medical, life insurance, and retirement plans, funded the plans, and controlled the nature and extent of each of these plans without any player involvement. The NFL made all changes to the plans unilaterally.

THE NFL'S MTBI COMMITTEE AND ITS MISREPRESENTATIONS

81.     Despite its unilateral duty and power to govern player conduct on and off the field, the NFL has for decades ignored, turned a blind eye to, and actively concealed the risks to players of repetitive sub-concussive and concussive head impacts, which can and do result in players being knocked unconscious or having "their bell rung" so that they are in a conscious but disoriented state.

82.     As one example, Cleveland Browns Quarterback Otto Graham was knocked unconscious during a game against the San Francisco 49ers in 1953 and he was carried off the field. After regaining consciousness, however, Graham returned to the field and played the balance of the game, even though his jaw required fifteen stitches after the game.

83.     Thus, since its inception, and continuing into the present, the NFL has been in a position that affords it a special relationship to NFL players as the guardian of their health and safety. For that reason, from its inception and continuing into the present, the NFL owed a duty of reasonable care to keep NFL players informed of neurological risks, to inform NFL players truthfully, and not to mislead NFL players about the risks of permanent neurological damage that can occur from MTBI incurred while playing football.

84.     By way of example only, during the decades of the 1930s through the 1960s, the NFL – in its supervisory role as guardian of player safety -- identified tackling techniques that exposed players to increased risks of injury, including head, neck, and leg injuries. Once identified, the NFL issued regulations which served as daily warnings to players of the hazardous nature of continuing to follow hazardous tackling techniques.

85.     As a result of its position of authority and repository of a composite of information throughout the League, the NFL was aware of how to protect NFL players from dangerous circumstances on the field and took insufficient measures to do so with regard to MTBIs.

86.     For decades, the NFL failed to warn NFL players of the medical risks associated with repetitive head impacts during NFL games and practices. Instead, the NFL ignored the risks and/or was willfully blind to the risks and/or actively concealed the risks from NFL players, despite its historic and proactive role as the guardian of player safety. For that reason, the NFL

breached its common law duty of reasonable and ordinary care to the Plaintiffs by failing to provide them with necessary, adequate, and truthful information about the heightened risks of latent neurological damage that arises from repetitive head impacts during NFL games and practices.

87.     On information and belief, over the past two decades, the NFL continued to exercise this common law duty and its unilateral authority to investigate and advise NFL players on many diverse and important topics, which should have included the recognition of circumstances that can precipitate MTBI, the long-term potential consequences of MTBI to NFL players, and solutions for players who have sustained MTBI.

88.     The NFL's concussion problem is not new.   In 1994, following the well-publicized retirements of NFL players Al Toon and Merrill Hoge, two players who both developed post concussion syndrome after extensive and repeated head injuries, the NFL overtly undertook a duty to study and research concussions on behalf of the professional football players in the NFL through its funding and staffing of the MTBI Committee.

89.     From 1994 until 2010, the NFL publicly inserted itself into the business of head injury research and openly disputed that any short-term or long-term harmful effects arose from football-related sub-concussive and concussive injuries. The NFL propagated its own industry funded and falsified research to support its position, despite its historic role as the guardian of player safety, and despite the fact that independent medical scientists had already come to the opposite conclusion.

90.     In 1994, then NFL commissioner Paul Tagliabue agreed to fund a committee to study the issue of head injury in the NFL. The NFL voluntarily and unilaterally formed the MTBI Committee to study the effects of concussions and sub-concussive injury on NFL players.

At that time, the current NFL Commissioner, Roger Goodell, was the NFL's Vice President and Chief Operating Officer.

91.     With the MTBI Committee, the NFL voluntarily inserted itself into the private and public discussion and research on an issue that goes to the core safety risk for players who participate at every level of the game. Through its voluntary creation of the MTBI Committee, the NFL affirmatively assumed a duty to use reasonable care in the study of concussions and post-concussion syndrome in NFL players; the study of any kind of brain trauma relevant to the sport of football; the use of information developed; and the publication of data and/or pronouncements from the MTBI Committee.

92.     Rather than exercising reasonable care in these duties, the NFL immediately engaged in a long-running course of fraudulent and negligent conduct, which included a campaign of disinformation designed to (a) dispute accepted and valid neuroscience regarding the connection between repetitive traumatic brain injuries and concussions and degenerative brain disease such as CTE; and (b) to create a falsified body of research which the NFL could cite as proof that truthful and accepted neuroscience on the subject was inconclusive and subject to doubt.

93.     The NFL's response to the issue of brain injuries and degenerative brain disease in retired NFL players has been, until very recently, a concerted effort of deception and denial. The NFL actively tried to and did conceal the extent of the concussion and brain trauma problem, the risks to the Plaintiffs, and the risks to anyone else that played football.

94.     The NFL's unparalleled status in the world of football gave the MTBI Committee's pronouncements on concussions authority and validity. The Plaintiffs, therefore, reasonably relied on the NFL's pronouncements and/or silence on this vital health issue.

95.     The MTBI Committee's stated goal was to present objective findings on the extent to which a concussion problem existed in the League, and to outline solutions. Ironically, the MTBI Committee's studies were supposed to be geared toward "improv[ing] player safety" and for the purpose of instituting "rule changes aimed at reducing head injuries."

96.     By 1994, when the NFL formed the MTBI Committee, independent scientists and neurologists alike were already convinced that all concussions—even seemingly mild ones— were serious injuries that can permanently damage the brain, impair thinking ability and memory, and hasten the onset of mental decay and senility, especially when they are inflicted frequently and without time to properly heal.

97.     Although billed as an independent group, the NFL's MTBI Committee was staffed with persons affiliated with NFL teams and who lacked sufficient specialized training or education relating to concussions to provide the players or the public reliable, accurate information on the risks posed by MTBI.

98.     In 2004, the NFL MTBI Committee announced its findings of "no evidence of worsening injury or chronic cumulative effects" arising from the multiple concussions often sustained by its football players.  Similarly, after conducting a related study the next year, the Committee announced that "many NFL players can be safely allowed to return to play" on the same day of a concussion if they are without symptoms and have been cleared by a physician.

99.     Also, in January of 2005, the Committee wrote that returning to play after a concussion "does not involve significant risk of a second injury either in the same game or during the season."  To the contrary, however, a 2003 NCAA study involving 2,905 college football players conclusively determined that those who have suffered a concussion are increasingly susceptible to another head injury for at least 10 days after the initial occurrence.

100.    In November 2006, *ESPN The Magazine* published an article that revealed the MTBI Committee's failure to include hundreds of neuropsychological tests conducted on players in the NFL to skew the results of those studies before releasing them to the general public. Additionally, the article discussed the firing of certain MTBI physicians for picking and choosing the data to include in Committee reports to deliberately downplay the injurious effects of concussions on players.

101.    In June 2007, the NFL convened a concussion summit for team doctors and trainers during which the co-chair of the MTBI Committee told attendees that CTE had never been scientifically documented in football players.   In August of that same year, the NFL distributed a concussion pamphlet to players stating that: "current research with professional athletes *has not shown* that having more than one or two concussions leads to permanent problems if each injury is managed properly.   It is important to understand that there is no magic number for how many concussions is too many."

102.    These statements, by the co-chair of the MTBI Committee and within the concussion pamphlet distributed to players, worked to create player reliance upon the false information promulgated by the MBTI Committee.

103.    In 2008, the University of Michigan's Institute for Social Research conducted a study on the health of retired players, with over 1,000 former NFL players taking part.   The results of the study, which were released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the League's former players vastly more often than in the national population—including a rate of 19 times the normal rate for men ages 30 through 49."   In response, the NFL, which had commissioned the study, claimed that it was incomplete and inconclusive.

104.    It was not until June of 2010 that the NFL publicly acknowledged that concussions can lead to dementia, memory loss, CTE and related symptoms by circulating warnings to every player and every team. This announcement accompanied a change in leadership and a re-naming of the NFL panel to the "Head, Neck, and Spine Medical Committee." Under its new leadership, the Committee finally admitted that data collected by the NFL's former brain-injury leadership team was "infected."

105.    After some sixteen (16) years of essentially ignoring the issue, the NFL has only just begun to take the concussion issue seriously. In the meantime, nueroanatomists have performed autopsies on thirteen (13) former NFL football players who died after exhibiting signs of degenerative brain disease. Twelve of those players were found to have suffered from CTE.

106.    Why League policy changes, accurate information sharing, and strict fines or warnings were not recommended to address this problem by the NFL's MBTI Committee soon after its creation in 1994, for Plaintiffs and NFL players alike, is difficult to comprehend. That it took sixteen (16) years to admit that there was a problem or initiate any real action to address the same is willful and wanton and exhibits a reckless disregard by the NFL for the safety of its players.

## CONGRESSIONAL INQUIRY INTO MTBI

107.    Shortly after the results of the Michigan study were released, Representative John Conyers, Jr., Chairman of the House Judiciary Committee, called for hearings on the impact of head injuries sustained by NFL players.

108.    At that hearing, Drs. Robert Cantu and Ann McKee offered independent testimony on the issues of the long-term impact of football-related head injuries.

109.    At the first hearing in October 2009, NFL Commissioner Roger Goodell acknowledged that the NFL owes a duty to the public at large to educate them as to the risks of concussions due to the League's unique position of influence: "In addition to our millions of fans, more than three million youngsters aged 6-14 play tackle football each year; more than one million high school players also do so and nearly seventy five thousand collegiate players as well. We must act in their best interests even if these young men never play professional football."

110.    When Representative Linda Sanchez questioned Goodell about the limited nature of the NFL's purported studies on repetitive traumatic brain injuries and concussions, the conflicts of interest of those directing the studies, and the potential for bias, Goodell evaded answering the questions.

111.    In January 2010, the House Judiciary Committee held further hearings on football player head injuries. Representative Conyers observed that "until recently, the NFL had minimized and disputed evidence linking head injuries to mental impairment in the future."

112.    Representative Sanchez commented that "[i]t seems to me that the N.F.L. has literally been dragging its feet on this issue until the past few years. Why did it take 15 years?"

113.    In the 2010 Congressional hearings, Dr. Ira Casson, a member of the NFL Defendants' MTBI Committee, gave testimony that denied the validity of other non-NFL studies and stated that "[t]here is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

114.    The members of the MTBI Committee, however, knew of the decades-old studies linking MTBI to long-term neurological problems. Casson, a MTBI Committee member since its

inception, stated before Congress on January 4, 2010, that he was "the lead author of a landmark paper on brain damage in modern boxers that was published in the [Journal of the American Medical Association] in 1984." That paper, which referenced the many studies documenting CTE in boxers, studied eighteen former and active boxers and found that eighty-seven percent of the professional boxers had definite evidence of brain damage. Specifically, the study determined that the subjects performed particularly poorly on neuropsychological tests measuring short-term memory.

115.    In his written statement to Congress, Dr. Casson stated that he has "been concerned about the possibility of long term effects on the brain related to football for close to thirty years." Dr. Casson offered that one of the reasons he "was asked to be on the NFL MTBI committee was because of [his] knowledge of and experience treating boxers with chronic traumatic encephalopathy (CTE)."

116.    This testimony contradicted Casson's testimony that "there is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

117.    After the Congressional hearings, the National Football League Players' Association ("NFLPA") called for the removal of Dr. Casson as MTBI Committee co-chair, and stated, "Our view is that he's a polarizing figure on this issue, and the players certainly don't feel like he can be an impartial party on this subject."

118.    After the removal of Dr. Casson and MTBI Committee members in the wake of the Congressional hearings, the Committee admitted that data collected by the NFL's formerly appointed brain-injury leadership was "infected," and said that their Committee should be assembled anew.

THE NFL DEFENDANTS' DUTIES TO THE PLAYERS AND THE PUBLIC

119.   By funding the MTBI Committee and by holding itself out as the ultimate authority on player safety, including safety from MTBIs, the NFL Defendants voluntarily undertook a duty to its players in the following respects:

a)      They owed a duty of reasonable care to protect Plaintiffs on the playing field;

b)      They owed a duty of reasonable care to educate Plaintiffs about the dangers of CTE and/or cognitive injury from MTBI;

c)      They owed a duty of reasonable care to Plaintiffs to promote a "whistleblower system" whereby teammates would feel comfortable addressing their concerns about the concussion injuries of another player to their trainers, physicians, coaches, etc.;

d)      They owed a duty of reasonable care to Plaintiffs to fashion the rules of the League to penalize players for using their head or upper body to hit or tackle;

e)      They owned a duty of reasonable care to Plaintiffs to promote research into a cure for CTE and the effects of repetitive concussion injuries over time; and

f)      They owed a duty of reasonable care to State governments, local sport organizations, the American Rules Football leagues and players, and the public at large to protect against the long-term effects of CTE and/or concussion injury.

THE NFL DEFENDANTS' BREACH OF THEIR DUTIES

120.   The NFL Defendants knew or had a reason to know the potential harmful effects of repeated concussions and/or head injuries for decades before the inception of the MBTI Committee.  Until June of 2010, however, it concealed this information from its coaches, its trainers, its players and from the general public.